UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHELLY LEANN HALL,

        Plaintiff,

    v.

KILO KIJAKAZI,

        Defendant.

No.  2:20-cv-02036-EFB

ORDER

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security denying her application for disability benefits under Title II of the Social Security Act.[1]  ECF No. 1.  The parties' cross-motions for summary judgment are pending.  ECF Nos. 19, 23.  For the reasons provided below, the court grants plaintiff's motion, denies the Commissioner's motion, and remands the case to the Administration for reconsideration.

**I.    Background**

      <u>Plaintiff's Prior DIB Application.</u>  Plaintiff initially applied for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) in December 2011, alleging that she became disabled on May 1, 2011.[2]  ECF No. 14-1 at 98-110.  The application was denied following a hearing; the ALJ concluded that plaintiff's mental impairments were non-severe, that

---

[1] The action is before the undersigned pursuant to the consent of the parties.

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq.

her seizure disorder and back pain were severe but did not meet or medically equal the severity of a listed impairment, that plaintiff's abdominal pain was caused by endometriosis and should resolve because plaintiff had recently undergone a hysterectomy, and that plaintiff retained the functional capacity to do her former clerical work. *Id.* Accordingly, the ALJ found plaintiff not disabled from May 1, 2011, through the ALJ's decision on July 11, 2014. The Social Security Administration's Appeals Council declined to review the determination, and plaintiff did not seek review in federal court. *Id.* at 114; ECF No. 19 at 7-8.

The DIB Application Currently Under Review. In March 2017, plaintiff again applied for DIB and also sought supplemental security income (SSI) under XVI of the Act, alleging that she became disabled on January 1, 2010.[3] ECF No. 14-1 (Administrative Record) at 21.[4] Plaintiff claimed severe impairments of epilepsy, back injury, anxiety, depression, and pancreas divisum.

---

[3] Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. For both DIB and SSI, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 42 U.S.C. §§ 423(d)(1)(A), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The steps are:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Yuckert*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

[4] Citations to the administration record refer to the pagination assigned by the court's electronic docketing system.

1    *Id.* at 379, 430.  After conducting two hearings, the presiding administrative law judge (ALJ)

2    found that plaintiff's pancreas divisum rendered her disabled as of March 6, 2017.  *Id.* at 31-32.

3    Because that date was after plaintiff's last date insured for DIB on December 31, 2014, plaintiff

4    was awarded SSI but not DIB.  *Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008) (to qualify for

5    DIB, a disability must exist before the claimant's last date insured); *see* 42 U.S.C. § 423.

6    　　　The ALJ found plaintiff's mental impairments of anxiety and depression non-severe.

7    ECF No. 14-1 at 24.  Consultative psychologist Sid Cormier, PhD, examined plaintiff on April

8    17, 2017, and diagnosed her with prescription opioid dependence, insomnia, and post-traumatic

9    stress disorder.  *Id.*  However, two state agency reviewing-source mental health consultants

10   (Christmas Covell, PhD, and Eugene Kester, PhD) opined that plaintiff's mental impairments

11   were not severe.  *Id.* at 24-25.  The ALJ gave Dr. Cormier's opinion little weight, finding that it

12   contained a few internal inconsistencies and was not entirely consistent with plaintiff's medical

13   records, which, according to the ALJ, contained little evidence of ongoing mental health

14   treatment. *Id.* at 25. The ALJ gave great weight to the opinions of Drs. Covell and Kester,

15   reasoning that their opinions were consistent with the evidence of plaintiff's treatment history.

16   *Id.*

17   　　　The ALJ found that, before March 6, 2017, plaintiff did not have an impairment or

18   combination of impairments that met or equaled the severity of a listed impairment.  *Id.* at 26.

19   Plaintiff's epilepsy was not listing-level severe because listing 11.02 required hospitalization for

20   seizures despite adherence to prescribed treatment, and plaintiff's records revealed that she had

21   not complied with her seizure medication.  *Id.*  Plaintiff also did not have marked limitations in

22   the domains of listings 11.02B-D.[5]  *Id.*

─────────────────

23   [5] In 2019, when the ALJ issued the decision in this case, listing 11.02 provided:

24   　　Epilepsy, documented by a detailed description of a typical seizure and
     　　characterized by A, B, C, or D:

25   　　A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a
     　　month for at least 3 consecutive months (see 11.00H4) despite adherence to

26   　　prescribed treatment (see 11.00C);  or

27   　　B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at
     　　least 3 consecutive months (see 11.00H4) despite adherence to prescribed

28

While no listing specifically encompassed plaintiff's pancreas divisum, the ALJ

concluded that listings 5.08 and 5.06B were relevant.[6]  *Id.*  According to the ALJ, plaintiff's

treatment (see 11.00C); or

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every
2 months for at least 4 consecutive months (see 11.00H4) despite adherence to
prescribed treatment (see 11.00C); and a marked limitation in one of the
following:

    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see
    11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    5. Adapting or managing oneself (see 11.00G3b(iv)); or

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks
for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed
treatment (see 11.00C); and a marked limitation in one of the following:

    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see
    11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    5. Adapting or managing oneself (see 11.00G3b(iv)).

[6] Listing 5.08 provided: "Weight loss due to any digestive disorder despite continuing treatment
as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days
apart within a consecutive 6-month period."

Listing 5.06B provided:

Inflammatory bowel disease (IBD) documented by endoscopy, biopsy,
appropriate medically acceptable imaging, or operative findings with:

***

B. Two of the following despite continuing treatment as prescribed and occurring
within the same consecutive 6-month period:

1. Anemia with hemoglobin of less than 10.0 g/dL, present on at least two
evaluations at least 60 days apart; or

2. Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least
60 days apart; or

3. Clinically documented tender abdominal mass palpable on physical
examination with abdominal pain or cramping that is not completely controlled by
prescribed narcotic medication, present on at least two evaluations at least 60 days
apart; or

4. Perineal disease with a draining abscess or fistula, with pain that is not

4

condition had not caused the necessary weight loss or supplemental nutrition to equal these listings. *Id.*

Plaintiff's chronic back pain did not meet or equal listing 1.04 because there was no evidence of spinal nerve root compression, plaintiff "presented to care with 5/5 strength in all extremities, 2+ reflexes, normal sensation normal coordination, and normal gait," and plaintiff did not need an assistive device to walk.[7] *Id.* at 26-27.

In making these determinations, the ALJ partially credited and partially discredited plaintiff's testimony, which he summarized as follows:

> The claimant alleges that she stopped working after being involved in a motor vehicle accident. She feels that she would be unable to work because stress and a lack of sleep trigger her seizures. She feels that she is prone to having a seizure at any time. She constantly feels sick and nauseated due to her pancreatic condition despite taking medication. She has intense migraines. She has a lack of sleep.

---

completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

5. Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart; or

6. Need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter.

[7] Listing 1.04 provided:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

5

1   There are days when she struggles to perform simple chores or take a shower. She
2   often lies down throughout the day.

3   *Id.* at 27.  According to the ALJ, these allegations were only partially supported by the evidence:

4   When considering the factors in Social Security Ruling 16-3p, there is evidence
    that is consistent with the claimant's allegations prior to March 2017. The
5   claimant has treated for reports of seizures and migraines with neurologist
    Harvinder, Birk, M.D. The claimant has also treated at Redding Spine and Sports
6   Medicine, Hill Country Health and Wellness Center, Greenville Rancheria, and
    Gateway Medical Center for back pain and pancreatitis. Consistent with her
7   allegations, progress notes show the claimant has presented with physical
    examination findings including diminished paraspinal muscles with spasms,
8   tenderness, limited range of motion, and decreased lower extremity sensation.
    Progress notes also show that the claimant has received Kenalog injections into
9   the suboccipital area bilaterally for migraines. (Ex. B1F, B2F, B3F, B5F). The
    claimant has also treated at emergency care on multiple occasions at Shasta
10  Regional Medical Center for abdominal pain. (Ex. B14F).

11  Further consistent with her allegations, an early CT scan of the lumbar spine dated
    January 11, 2013 showed sclerotic benign bone islands within the L2 vertebral
12  body, small broad-based disc bulges at L3-4 and L4-5, and a small central disc
    protrusion at L5-S1. (Ex. B2F/115). An April 22, 2013 MRI showed a few
13  scattered disc bulges of the lumbar spine. (Ex. B2F/115). By October 1, 2014, the
    claimant underwent a right sacroiliac joint injection. (Ex. B2F/114). By July 16,
14  2015, hepatobiliary imaging showed enterogastric reflux. (Ex. B2F/126). From
    October 31, 2015 through November 3, 2015, the claimant was hospitalized for
15  recurrent grand-mal seizure episodes. (Ex. B14F/249). By January 18, 2016, a
    lumbar spine x-ray showed some exaggeration of the normal lumbar lordosis. (Ex.
16  B2F/131).

17  Although there is some evidence that lends some support for the claimant's
    allegations, her allegations are not entirely consistent with the evidence prior to
18  March 2017 when considering the factors in Social Security Ruling 16-3p. For
    example, Dr. Burke treated the claimant on August 4, 2014 and stated that he was
19  "not sure about the cause for seizures" after reviewing a brain MRI and EEG that
    showed normal findings during a then-recent hospitalization. (Ex. B1F/13).
20  Although the claimant has presented to care with abnormal physical examination
    findings, Dr. Burke has also noted 5/5 strength in all extremities, 2+ reflexes,
21  normal sensation normal coordination, and normal gait. (Ex. B1F, B2F). When
    the claimant evaluated for complaints of low back pain with radiation into the
22  right groin and medial extremity on August 6, 2014, an electrodiagnostic study
    showed no evidence of a lumbar radiculopathy, plexopathy, focal peripheral nerve
23  compromise, or large fiber peripheral polyneuropathy. At most, the study showed
    non-specific left fibular motor response findings suggestive of a remote history of
24  ankle or foot trauma. (Ex. B2F/103).

25  By September 12, 2014, the claimant reported that she had been better with her
    seizures and migraines. (Ex. B1F/10). Although the claimant reported increased
26  migraines on November 13, 2014, she also reported that her last seizure occurred
    as far back as May 2014. (Ex. B1F/7). By October 13, 2014, the claimant reported
27  that she was doing well and she was mostly satisfied with the results of her
    sacroiliac joint injections (Ex. B2F/114) such that her provider recommended that
28  she increase her core strengthening exercises (Ex. B2F/115). By November 6,

2014, the claimant reported that she had not had a seizure within the prior five months since May 2014. (Ex. B2F/78). By March 10, 2015, the claimant continued to report that she had no seizures since May 2014 and she in fact was able to get her driver's license back from the Department of Motor Vehicles. (Ex. B2F/71). By April 28, 2015, the claimant declined a prescription for Phenergan and instead opted to take the medication she had a home for nausea and vomiting. (Ex. B2F/67).

When the claimant evaluated for nausea, vomiting, and abdominal pain on April 29, 2015, an ultrasound showed no significant abnormalities about the abdomen with a normal appearance of the pancreas. (Ex. B2F/123). By September 18, 2015, the claimant reported that she had not had any seizures, trazodone was helping her to sleep, and Prevacid was helping with her stomach symptoms despite reporting that her pain medication offers little relief. (Ex. B2F/29). When the claimant evaluated for acute pancreatitis on July 7, 2015, a CT scan showed negative findings about the abdomen, her pancreas appeared normal with no enlargement, stranding of the peripancreatic fat, or dilation of the pancreatic duct. (Ex. B2F/125).

During an October 31, 2015 hospitalization for grand-mal seizures, the claimant's symptoms were attributed to non-compliance with medication, with her lab work sowing a carbamazepine level of 1.6 whereas the normal range was between 4 and 12. (Ex. B14F/249). In fact, the claimant's discharge diagnoses included: "2. Long history of epilepsy with noncompliance. Advised to be compliant with her medication." (Ex. B14F/249). By February 2, 2016, the claimant was discontinued from Ativan after being deemed to have violated her controlled substance management agreement. The claimant's provider noted that the claimant was not taking Ativan on schedule, Ativan was not in her urine, she did not bring in her prescription bottles the week prior, she had empty prescription bottles eight days early, and she appeared intoxicated at multiple visits. (Ex. B2F/10, 12). In fact, the claimant's provider stated that the claimant complained of abdominal pain but her lab work was normal and her exam was normal "when she is distracted." (Ex. B2F/10).

Since beginning treatment at Greenville Rancheria, July 29, 2016 progress notes show that the claimant was prescribed Norco (Ex. B3F/27) and she was noted as having fair control over her chronic pain (Ex. B3F/26). By November 30, 2016, the claimant reported that she had not had a seizure over the prior 13 months despite reporting issues with her memory. (Ex. B1F/1). While the claimant was transitioned to aquatic physical therapy after reported markedly increased pain with land-based physical therapy (Ex. B3F/11), March 2, 2017 physical therapy recertification notes state that she demonstrated overall mild improvements in pain with reports of intermittent improvements in functional range of motion, strength, and activity tolerance (Ex. B4F/4).

Despite her allegations, the claimant reported that she had not had a seizure since October 31, 2015 when she attended an epilepsy consultation at UC San Francisco Medical Center on May 2, 2017. (Ex. B7F/7). In fact, the claimant's treatment plan during the consultation included recommendations that she continue with her CBZ medication and that she continue driving with a referral for video/EEG monitoring. (Ex. B7F/11).

*Id.* at 27-29.

7

1      The ALJ also discredited the testimony of plaintiff's fiancé:

2          Nicholas Paxman, the claimant's fiancé, completed a Function Report and stated
           that the claimant's epilepsy causes her to have numerous mental and physical
3          issues. She has a hard time concentrating. She has difficulty transposing numbers
           and letters due to double or blurred vision. She has difficulty following
4          instructions. She has totaled four vehicles due to her seizures or medication side
           effects. She has difficulty sleeping. She needs help with person care on occasion.
5          She is less active with hobbies. She is socially withdrawn. She could walk for 15
           to 20 minutes before she must rest. She has difficulty handling stress and changes
6          in routine. She is anxious and depressed. (Ex. B3E).

7          The undersigned gives little weight to Mr. Paxman's statements, to the extent that
           his statements concern the claimant's functioning prior to March 2017. Although
8          Mr. Paxman's lay statements are based upon his observations of the claimant,
           Drs. Brodsky and Rowley's professional and opinions show that the claimant is
9          more functional than alleged. Furthermore, Mr. Paxman's observations are not
           entirely consistent with treatment records that show that the claimant has had
10         issues with anti-seizure medication compliance, her reports of being seizure-
           free for as long as five months to a year, her reports to Dr. Cormier of being
11         independent with activities of daily living, and the lack of documentation of
           ongoing mental health-specific treatment. Accordingly, the undersigned gives
12         little weigh to Mr. Paxman's statements.

13   *Id.* at 30.  Relying on the opinions of state agency reviewing-source physicians S. Brodsky, D.O.,

14   and Patty Rowley, M.D., as well as the testifying vocational expert, the ALJ concluded that, prior

15   to March 6, 2017, plaintiff retained the residual functional capacity to perform her former clerical

16   work.  *Id.* at 29-31.

17         However, the ALJ found that the medical record supported plaintiff's testimony with

18   regard to her pancreas divisum after March 6, 2017:

19         Although the claimant's allegations are not entirely consistent with the evidence
           prior to March 2017, her allegations are consistent with evidence since that date
20         that shows that her condition has worsened. For example, the claimant has
           continued to treat for abdominal pain and vomiting related to pancreatitis and
21         pancreas divisum at Hill Country Health and Wellness Center. (Ex. B13F). The
           claimant has also treated at emergency care on multiple occasions for abdominal
22         pain. (Ex. B14F). On November 9, 2018, the claimant underwent an endoscopic
           retrograde cholangiopancreatography procedure with injection of the minor
23         papilla with a Cramer catheter. However, the surgeon had an unsuccessful
           cannulation of the minor papilla. (Ex. B15F/57). On December 27, 2018, the
24         claimant presented to emergency care with reports of abdominal pain. (Ex.
           B15F/84). During her stay, a CT scan showed pancreatic divisum. (Ex. B15F/51).
25         On April 9, 2019, the claimant underwent an ERCP, which showed pancreatic
           changes of hyperechoic strands, foci, and mild lobularity in addition to pancreatic
26         divisum. (Ex. 16F).

27         The claimant's allegations are also consistent with opinion evidence that shows
           that her condition has worsened. For example, Jennifer Franchuk, M.D., the
28         claimant's provider at Hill Country Health and Wellness Center, wrote a letter

dated March 26, 2019 and stated that the claimant was being worked up for chronic abdominal pain due to a functional defect in her pancreas. Dr. Franchuk stated that the claimant is unable to lift heavy weights, stoop or crouch frequently, or sit without changing positions constantly. Dr. Franchuk stated that the claimant's medication is ineffective at controlling her pain and that she is unable to work in any capacity. (Ex. B12F/1).

At the September 11, 2019 hearing, reviewing-source medical expert Nikerson Geneve, D.O. testified that there is no listing directly on-point that addresses the claimant's pancreatic divisum. However, Dr. Geneve testified that the claimant's impairments medically equal the digestive disorder listings. Dr. Geneve noted the claimant's testimony concerning her chronic and persistent symptoms, physical examination findings of abdominal tenderness, and her requirement for stenting. Dr. Geneve stated that the claimant's workup for abdominal pain was negative until December 4, 2017. Therefore, Dr. Geneve opined that the claimant's impairments have medically equaled the digestive disorders listings since December 4, 2017.

The undersigned generally gives great weight to Drs. Franchuk and Geneve's opinions. These opinions are consistent with the evidence including the claimant's ongoing treatment for chronic abdominal pain, her requirement for the endoscopic retrograde cholangiopancreatography procedure on November 9, 2018, and the April 9, 2019 ERCP showed ongoing pancreatic divisum.

Although Dr. Geneve opined that the claimant's impairments have equaled the digestive system listings since December 4, 2017, the undersigned finds that her impairments have equaled the listings since her supplemental security income application filing date and not prior to the date last insured. Although the claimant testified that her abdominal pain occurred and was undiagnosed prior to December 2017, the July 7, 2015 CT scan showed normal pancreatic findings. (Ex. B2F/125). However, the claimant continued to treat for abdominal pain with emergency care visits since 2016 (Ex. B14F) and the November 9, 2018 cholangiopancreatography report showed a post-procedure diagnosis for pancreas divisum. (Ex. B15F/57). The undersigned therefore finds that the claimant's impairments have medically equaled the digestive system listings since the supplemental security income application filing date, but not before the date last insured.

*Id.* at 31-32.

The administrative record contains hundreds of pages of plaintiff's medical treatment records as well as the transcript for the two hearings held by the ALJ, which the court summarizes below.

A. *Abdominal Pain, Pancreatitis, and Pancreas Divisum*

Hearing Testimony. At the hearing on March 27, 2019, plaintiff testified that she had formerly worked as a typist clerk for Shasta County, but could not do that work now "between my pancreas, constantly being sick and nauseous, up all night, not getting any sleep." *Id.* at 75. She's been seeking treatment for the symptoms caused by her pancreatic condition since 2009,

but doctors had only recently figured out that the symptoms were caused by her pancreas.  *Id.* at 76.  "[T]hen it was an argument of whether I was setting it off myself by dietary or drinking or whatnot.  And then they finally realized, no, it's actual birth defects[.]"  *Id.*  Valves that should be connected to her pancreas are not connected correctly.  *Id.* at 77.

Plaintiff visited the ER 18 times for her pancreatic pain in 2018.  *Id.* at 80.  She visits the ER when her pain and nausea become unmanageable at home, she's vomited blood, or she's become severely dehydrated.  *Id.*  Plaintiff takes Norco and ibuprofen for her pain, Creon for her pancreatic enzyme, and Protonix for her nausea and vomiting.  *Id.* at 81-82.  The Norco merely takes the edge off of the "constant relentless pain," which is generally at about a five on the pain scale but can spike to 12.  *Id.* at 84-85. When the pain spikes, she's constantly vomiting, having diarrhea, and cannot keep any food down.  *Id.* at 85.  She can't sleep, and her abdomen is so swollen and painful that she cannot let anything touch it.  *Id.*

At the hearing on September 11, 2019, plaintiff testified that doctors had recently unsuccessfully tried to place a stent in her pancreas.  ECF No. 14-1 at 47-48.  A doctor told her that her pancreas is so damaged at this point that a stent will not fix the problem.  *Id.* at 48.  Her pancreas "is not hooked up at all."  *Id.*  The problem with her pancreas was caused by a birth abnormality that has caused the pancreas to become increasingly scarred and damaged by recurrent flare-ups.  *Id.*  The pain from her pancreas used to wax and wane but is now "nonstop" and particularly severe at night, causing plaintiff to lose sleep.  *Id.* at 53, 56.  The condition prevents her from tolerating food.  *Id.*

Plaintiff testified that she had experienced abdominal pain since 2009.  *Id.* at 58.  Plaintiff experienced the same symptoms of abdominal pain and food intolerance for years but "nobody could diagnose what was going on."  *Id.*  She had quit her job in 2009 partially due to the pain.  *Id.* at 59.  Her pancreatic issues were finally discovered in 2015, when a lipase amylase test showed pancreatic enzymes at 5,600 when they should have been around 192.  *Id.* at 60.

Medical expert Nickerson Geneve, D.O., testified that plaintiff's pancreas divisum medically equaled the severity of listed ailments and had since December 4, 2017, the first date that he found "documentation of the diagnosis of acute and chronic pancreatitis" and "definite

documentation of the abdominal pain and so on." *Id.* at 57.  Dr. Geneve had not seen evidence of elevated pancreatic enzymes in 2015, but had seen a record of elevated enzymes (at 953) on December 4, 2017.  *Id.* at 61.  Elevated lipase indicates possible pancreatic inflammation or pancreatic disorder.  *Id.*

Medical Records.  At a CT scan of plaintiff's abdomen on February 24, 2011, her pancreas appeared unremarkable.  *Id.* at 1189.  Plaintiff began treatment at UC Davis Medical Center for her abdominal pain later that year.  *Id.* at 1275.  Various diagnostic tests did not reveal her pancreas divisum.  *Id.*

On January 20, 2012, plaintiff went to the ER after two days of vomiting.  *Id.* at 1155.  Plaintiff reported having the problem for about a year, along with severe back pain.  *Id.*  Plaintiff had gotten a hysterectomy, as the pain had been thought to be caused by endometriosis, but the pain and vomiting had not resolved.  *Id.*  The cause of plaintiff's pain and nausea was unknown.  *Id.*  Plaintiff appeared "in considerable agony" and had "incessant retching in the emergency department."  *Id.*  Dr. Sagar Bedi wrote that plaintiff's "symptomatology remains obscure" and "at this time I do not have any answers for the patient."  *Id.* at 1159.  A CAT scan of plaintiff's abdomen did not reveal the cause of the pain.  *Id.* at 1165.

Plaintiff obtained medical care between 2014 and 2016 at the Hill Country Health and Wellness Center, from physician's assistant Summer Ross, nurse practitioner Susan Foster, and Dr. Diana Holscher.

On August 12 and September 29, 2014, nurse Foster noted that plaintiff's abdomen was soft and nontender.  *Id.* at 548, 554.  Plaintiff denied experiencing diarrhea, vomiting, constipation, and abdominal pain on both dates.  *Id.*  But on November 6, 2014, plaintiff complained to nurse Foster of diarrhea for the prior six weeks.  *Id.* at 540.  She had made a variety of dietary changes that had not helped.  *Id.*  Her stomach hurt right before she had to go to the bathroom, but not otherwise.  *Id.*  Nurse Foster found plaintiff's abdomen generally tender on examination.  *Id.* at 541.  Nurse Foster ordered stool studies.  *Id.* at 542.

/////

/////

On March 10, 2015, nurse Foster saw plaintiff for her back pain. *Id.* at 534. Plaintiff did not complain of abdominal pain, although an abdominal examination revealed generalized tenderness with palpation. *Id.*

On April 28, 2015, plaintiff told PA Ross that she had been experiencing pain in her left side with vomiting for two weeks. *Id.* at 527. The pain was in her left upper ribs, on the inside, where it felt bloated. *Id.* Plaintiff reported that she had had "GI issues" in the past. *Id.* PA Ross noted that plaintiff's abdomen was tender at her left lower rib cage and very tender between the ribs. *Id.* PA Ross ordered testing to determine whether plaintiff was suffering from costochondritis, pancreatitis, gastritis, or another ailment. *Id.* at 529. An April 29, 2015, an ultrasound of plaintiff's abdomen showed no abnormalities; the pancreas "appear[ed] to be normal." *Id.* at 585.

On May 1, 2015, plaintiff was admitted to the hospital overnight for abdominal pain she had felt for ten days with associated vomiting. *Id.* at 1129. Plaintiff had been vomiting two to three times each day. *Id.* at 1136. Dr. Usha Reddy wrote in his notes "please consider changing [Tegretol] to new or antiepileptics due to possible side affect of pancreatitis." *Id.* Her lipase was high at 1678, and her amylase was high at 196. *Id.* By the time she was released, her lipase level had returned to normal. *Id.* A CT scan of her abdomen revealed no acute abnormality. *Id.* at 1144.

On May 4, 2015, plaintiff reported to nurse Foster that she was experiencing pain at a 6/10 in the pain scale in her back and abdomen that had recurred for "years." *Id.* at 520. Plaintiff told nurse Foster that she had been "worked up with EGD" in 2012 but believed that she had been experiencing pancreatitis that was misdiagnosed. *Id.* However, Dr. Reddy believed plaintiff's abdominal pain was caused by her seizure medication. Tegretol.[8] *Id.* Nurse Foster prescribed Omeprazole and a low-fat diet. *Id.* at 523-24.

/////

---

[8] Many medical providers over the course of the years believed plaintiff's pancreatitis was caused by Tegretol. *E.g. id.* at 675 (May 27, 2016 notation that "there is some concern it [Tegretol] is causing pancreatitis.") & 824 (May 31, 2018 notation that plaintiff suffered from "chronic pancreatitis secondary to medications").

On May 10, 2015, plaintiff went to the ER because of abdominal pain she had felt for two days. *Id.* at 1120. The pain radiated to her back and caused nausea and night sweats. *Id.* Her lipase level was normal. *Id.* at 1123. On May 11, 2015, plaintiff reported to Nurse Foster that she had been to the ER the previous day for pancreatitis. *Id.* at 515. Horrible pain woke her during the night. *Id.* Nurse Foster directed plaintiff to continue taking Norco for pain and to take Creon for her pancreatitis. *Id.* at 518.

Plaintiff was admitted to the hospital on May 25, 2015, for two days due to abdominal pain. *Id.* at 1094. Dr. Mohamad Haboukh wrote that plaintiff had begun having recurrent acute pancreatitis "this year." *Id.* at 1095. Her lipase level was "very high" at 5000. *Id.*; *see also id.* at 1099. ER records from May 30, 2015, show that plaintiff returned due to abdominal pain that had begun a few days earlier, since her release from the hospital. *Id.* at 1085.

On June 15, 2015, plaintiff told nurse Foster that her pancreas pain was "overriding" her back pain, which she assessed at a 6/10 on the pain scale. *Id.* at 509. She had been admitted to the hospital about a month earlier for two days for pancreatitis. *Id.* at 508. Nurse Foster ordered CT scans "to assess chronic vs. acute pancreatitis." *Id.* at 511.

On July 7, 2015, a CT scan of plaintiff's abdomen showed no abnormality. *Id.* at 587. Her pancreas appeared normal and non-enlarged. *Id.*

On July 8, 2015, plaintiff reported to nurse Foster that she had been having "lots of diarrhea," throwing up when her pain was intense, and experiencing periodic nausea. *Id.* at 503. Plaintiff had been taking pancreatic enzymes about once per day, when she remembered to do so. *Id.* Her abdomen was tender on examination in the upper left quadrant and in between her ribs. *Id.* at 505. Nurse Foster ordered CT scans, with and without contrast, of plaintiff's abdomen. *Id.* at 506.

Plaintiff returned to the ER on July 10, 2015, because of abdominal pain and vomiting. *Id.* at 1064. Her lipase was measured at 472. *Id.* at 1067. On July 11, 2015, plaintiff returned to the ER due to her abdominal pain. *Id.* at 1053. Plaintiff had been seen for the pain the prior month, but it had not gone away. *Id.* She told the care provider that her primary doctor believed

/////

13

1   her pancreatitis was caused by Tegretol.  *Id.*  Her pain prevented her from sleeping the prior

2   night, caused vomiting and nausea, and rated an 8/10.  *Id.*

3       On August 14, 2015, plaintiff reported to nurse Foster that she had been vomiting

4   periodically.  *Id.* at 497.  Plaintiff complained of abdominal pain, nausea, loss of appetite, and

5   vomiting.  *Id.*  Nurse Foster noted tenderness in the upper left quadrant of plaintiff's abdomen,

6   especially with palpation, but no masses.  *Id.*  Plaintiff also had tenderness in her upper left

7   quadrant and her abdomen was "very tender" between her ribs.  *Id.*  Nurse Foster directed

8   plaintiff to continue taking Prevacid and ordered a diagnostic test for her abdomen.  *Id.* at 500.

9       Plaintiff went to the ER on September 9, 2015, complaining of pain in her pancreas.  *Id.*

10  at 1040.  At a September 18, 2015, appointment, plaintiff reported to Dr. Holscher that Prevacid

11  had been helping her stomach symptoms.  *Id.* at 491.  She denied experiencing nausea, vomiting,

12  diarrhea, constipation, or abdominal pain.  *Id.*  Her abdomen was normal and non-tender on

13  examination.  *Id*. at 492.

14      On January 14, 2016, Dr. Holscher wrote that plaintiff complained of "abdominal pain

15  and thinks her pancreas might be flared."  *Id.* at 478.  On examination, however, her abdomen

16  was "soft, non-tender, [having] no masses, bowel sounds normal."  *Id.* at 489.

17      On February 18 and 22, 2016, plaintiff went to the ER due to left upper abdominal pain

18  and nausea.  *Id.* at 992.  On February 25, 2016, plaintiff complained to Dr. Holscher of

19  abdominal pain and suspected her pancreas was flared.  *Id.* at 472.  However, plaintiff's lab

20  results were normal and her exam was normal "when she is distracted."  *Id.*

21      Plaintiff went to the ER several times in April 2016 with "constant, cramping, left upper

22  abdominal pain radiating to her back."  *Id.* at 966-991.  The pain rated an 8/10 and was

23  accompanied by nausea and vomiting.  *Id.*  She reported a long history of pancreatitis caused by

24  her seizure medication.  *Id.* On May 15, 2016, plaintiff again went to the ER due to abdominal

25  pain that she believed was caused by pancreatitis.  *Id.* at 957.  Plaintiff returned to the ER on

26  September 9, 2016, due to "constant left upper abdominal pain" that had begun three days

27  earlier.  *Id.* at 948.  She believed her pancreas might be flaring up and had also been

28  experiencing nausea and vomiting.  *Id.*

On a March 13, 2017, third-party function report, plaintiff's fiancé Nicholas Paxman reported, "Stress has lately been causing [plaintiff] a lot of stomach and vomiting issues." *Id.* at 393.

On April 17, 2018, Dr. Paramvir Singh performed an endoscopic ultrasound on plaintiff due to her recurrent acute pancreatitis with chronic abdominal pain, nausea, and emesis. *Id.* at 712. The test revealed complete pancreas divisum. *Id.*

Hospital records from 2018 corroborate plaintiff's testimony that she visited the ER many times in 2018 due to her pancreatic pain.[9] *Id.* at 761-798, 822-930, 937.

In a letter dated March 26, 2019, Dr. Jennifer Franchuk wrote that plaintiff was in the process of being worked up due to chronic abdominal pain caused by the functional defect in her pancreas. *Id.* at 722. Dr. Franchuk wrote that plaintiff's "pain is abdominal, constant and unrelenting. Its severity prevents the patient from working at her full functional capacity." *Id.* According to Dr. Franchuk, plaintiff's current medication was ineffective at controlling her pain. *Id.* "[U]ntil definitive treatment, she is unable to work in any capacity, functionally or mentally." *Id.* Medical records from Dr. Franchuk from 2018 and 2019 corroborate her statements regarding the pain and disability caused by plaintiff's pancreatic condition. *Id.* at 743-56.

B. *Seizures and Migraines*

Hearing Testimony. At the March hearing, plaintiff testified that her seizures began in 2011. *Id.* at 87. Many neurologists had told her that her lack of sleep, which is caused by her pancreatic symptoms and possibly her anxiety, could cause her to experience seizures "which scares me trying to get into a vehicle and commute every day to work." *Id.* at 75. She had experienced a seizure in July 2016 and in November 2016. *Id.* at 79. If she has a seizure at home and no one gets injured, she doesn't seek medical attention. *Id.* at 79. However, she has

/////

---

[9] As there is no dispute that plaintiff's pancreas divisum rendered her disabled as of March 6, 2017, the court will not elaborate on plaintiff's medical records concerning her pancreatic condition after that date.

had five seizures while driving that have resulted in accidents and for which she has received medical care.  *Id.* at 79-80.

Plaintiff testified that she takes Imitrex for her migraines.  *Id.* at 82.  She experiences migraines about once per week and had recently suffered one that lasted four-to-five days and was not reduced by the Imitrex.  *Id.*  Plaintiff stayed in bed in the quiet dark.  *Id.* at 82-83.

<u>Medical Records.</u>  On February 24, 2011, plaintiff was taken to the hospital by her partner who had seen her that morning unconscious, unresponsive, eyes rolled back in her head, and mouth foaming.  *Id.* at 1200.  She remained unresponsive for about five minutes and then slowly came back around.  *Id.*  Plaintiff had suffered a similar episode the previous day and had had a headache for 24 hours.  *Id.*  She had vomited several times.  *Id.*

On May 9, 2014, plaintiff went to the ER after having seizures that morning.  *Id.* at 1168.  Plaintiff was admitted to the ICU in critical condition because she was "hypoxic with metabolic acidosis" (sepsis).  *Id.* at 1169.

On May 24, 2014, plaintiff went to the ER complaining of fatigue and confusion.  *Id.* at 1146.  She had felt unsteady on her feet since her release from the ICU, with a headache for the preceding three days.  *Id.*

For a number of years, plaintiff saw neurologist Harvinder Birk, M.D.  The record contains his chart notes from 2014 through 2017.  On August 4, 2014, Dr. Birk memorialized an appointment with plaintiff for seizures, migraines, and memory loss "likely due to Topamax." *Id.* at 457.  Dr. Birk wrote that plaintiff had been experiencing seizures at night which were followed by memory loss.  *Id.*  Although plaintiff had been taking Topamax since October 2013, the medication was not controlling her seizures.  *Id.*  Plaintiff had been hospitalized in May (presumably of 2014) "and she had a seizures [sic] with blood infection."  *Id.*  During hospitalization, plaintiff underwent a brain MRI and EEG which were normal.  *Id.*  Dr. Birk diagnosed plaintiff with seizure, memory deficits, and migraines.  *Id.*

Plaintiff reported to Hill Country Health and Wellness on July 16, 2014, that her seizure medication, Keppra, made her sedated and "super bitchy," such that "she can not even stand to be around herself."  *Id.* at 558.  At plaintiff's September 12, 2014, appointment with Dr. Birk,

16

plaintiff reported no seizures or migraines since the last appointment. *Id.* at 454. No change in treatment was warranted. *Id.* at 455. However, by her November 13, 2014, appointment, plaintiff was experiencing three migraines each week. *Id.* at 451. Her seizures remained well controlled. *Id.* at 452. Dr. Birk lowered her Topamax dosage and added a prescription for Cyproheptadine. *Id.*

Nurse Foster provided a summary of plaintiff's seizures on December 11, 2014 that is consistent with Dr. Birk's notes:

> In 2011 patient experienced two tonic/clonic seizures with subsequent negative work up by the emergency department. Patient went seizure free until October 2013 when she experienced two tonic/clonic seizures within a twenty four hour period. Again a negative medical/neurological work up was performed. Patient was started on seizure medications and has been seizure free since May 2014.

*Id.* at 466.

On March 10, 2015, plaintiff reported to nurse Foster that she had not had a seizure since May 2014 and had been able to get her driver's license back. *Id.* at 533. However, plaintiff went to the ER on May 16, 2015 after having a seizure that morning. *Id.* at 1111. She reported three episodes of seizures followed by vomiting, headaches, and stomach pain. *Id.* She had not been taking all her Tegretol doses "because of associated stomach trouble." *Id.* Her pancreatitis had prevented her from sleeping well, which she thought might have caused the seizures. *Id.*

At an ER visit on September 9, 2015, plaintiff complained that she had been suffering a migraine for the past three days. *Id.* at 1040. On September 18, 2015, plaintiff reported to nurse Foster that she had been experiencing migraines intermittently for the past few weeks. *Id.* at 490. She had gone to the emergency room for the migraine where they had given her Zofran, Toradol, and Dilaudid and hydrated her with intravenous fluids. *Id.* Plaintiff thought that the migraines might have been caused by her stopping use of Fentanyl patches that had been prescribed for her chronic back pain. *Id.* at 490-91.

Plaintiff was admitted to the hospital for four days on October 31, 2015, after experiencing several seizures. *Id.* at 1009. Dr. Amit Bawa noted that the seizures were likely caused by plaintiff's failure to take the proper dosage of her Tegretol. *Id.* Dr. Bawa wrote that plaintiff had a "long history of epilepsy with noncompliance." *Id.*

17

At a November 17, 2015, appointment, Dr. Holscher noted plaintiff's October hospitalization for seizures. *Id.* at 484. The seizures caused her to experience urinary incontinence and to fall in the shower. *Id.* Since the seizures, she had experienced coughing, wheezing, fevers, and vomiting. *Id.* Dr. Holscher noted that plaintiff had also had a seizure in April 2015 while off her seizure medication (Tegretol) due to vomiting. *Id.* at 485.

On February 12, 2016, plaintiff reported to Dr. Birk that her migraines were stable. *Id.* at 448. On November 30, 2016, plaintiff had not had any seizures for 13 months, but her memory issues persisted. *Id.* at 445.

On March 13, 2017, plaintiff completed a seizure questionnaire in which she recorded that she has been having seizures since 2011. *Id.* at 395. She had had a seizure in October 2015 but was unsure of the date of her three other most recent seizures. *Id.* When she has a seizure, she experiences loss of consciousness, convulsions, and loss of bladder control. *Id.* After the seizure, she feels terrible, with a "horrible headache/migraine, bad body aches/muscle aches," and difficulty thinking and speaking. *Id.* These effects typically last one week. *Id.* Plaintiff had been taking Tegretol three times per day for two years unless she forgets, and the medication was "pretty good" at controlling her seizures. *Id.* at 396.

In a function report completed the same day, plaintiff described her epilepsy as follows:

> Epilepsy: On a daily basis this condition makes it hard to concentrate – therefore losing my train of thought quite frequently. This condition along with many of its treating medications cause double/blurred vision – making it easy to transpose letters and numbers. Condition/medication also causes short-term memory loss – making even daily routines and activities hard to remember. The memory loss issues makes [sic] it difficult for me to follow oral and sometimes even written instructions. Condition/medication makes it hard to get motivated as they cause fatigue and sleepiness. Vomiting and diarrhea also accompany this condition – making it hard at times to find and use a restroom in time. Once I have suffered an epileptic episode I am rendered either bedridden for the next week with severe migraines and body aches from seizing or hospitalized until seizures have stabilized and my levels have returned to normal – typically 3-5 days.

*Id.* at 398.

On Mr. Paxman's March 2017 function report, he wrote that plaintiff's epilepsy causes plaintiff to have difficulty concentrating and to experience blurred or double vision. *Id.* at 387.

/////

18

It was hard for plaintiff to follow written and oral instructions.  *Id.*  Plaintiff had totaled four cars in two years from either seizures or medication side effects.  *Id.*

At an exam at UCSF Medical Center on May 2, 2017, Dr. June Yoshii-Contreras noted that plaintiff had been taking Tegretol (referred to in the report as "CBZ" for generic name carbamazepine) for her seizures and had been seizure-free since October 2015.  *Id.* at 696.  Her driver's license had been reinstated multiple times after six-months of seizure freedom only to be followed by car accidents caused by seizures (four accidents in total).  *Id.*

Plaintiff saw Dr. Birk on October 16, 2017, complaining that, while her seizures were stable on Tegretol, her migraines were not improving.  *Id.* at 758.

On July 14, 2018, plaintiff went to the ER due to having a seizure.  *Id.* at 797.

C.  *Chronic Back Pain*

Medical Records.  In his August 4, 2014, treatment notes, Dr. Birk noted "spasm in the cervical paraspinals muscles present with tenderness and limitation to ROM to flexion and extension Sub occipital tenderness bilateral."  *Id.* at 459.  He prescribed a Kenalog injection into the suboccipital area. *Id.*  The same notation remains present in all of Dr. Birk's subsequent treatment notes.

On August 6, 2014, plaintiff was seen by Joseph Purcell, D.O., who performed nerve conduction, motor, reflex, and "EMG" testing on plaintiff's legs, ankles, and lumbar spine.  *Id.* at 564.  Dr. Purcell concluded that the testing revealed only a "non-specific finding of uncertain clinical significance" that was possibly caused "by remote history of ankle or foot trauma."  *Id.* at 565.

Plaintiff saw Dr. Annie Purcell on August 11, 2014, still complaining of the same back pain, which ranged from 2 to 10 out of 10 on the pain scale but was generally at 5/10.  *Id.* at 567.  Plaintiff described the pain as constant, throbbing, burning, and deep.  *Id.*  It was worse with prolonged standing, lying down flat, bending, and stooping.  *Id.*  Three epidural injections had not helped.  *Id.*  Plaintiff could not perform heel-toe walking due to the pain.  *Id.* at 568.  Her lower extremity strength was good.  *Id.*  While Dr. Purcell found no tenderness at the lumbar spine, plaintiff's lumbar range of motion was limited in all directions due to pain.  *Id.*  Dr.

19

Purcell found tenderness on palpation on plaintiff's sacroiliac joints.  *Id.*  Dr. Purcell diagnosed plaintiff with bilateral sacroiliac joint disorder and chronic low back pain after reviewing plaintiff's records, including Dr. Joseph Purcell's diagnostic findings.  *Id.* at 569.

On August 12, 2014, plaintiff reported back pain at a 10/10 on the pain scale to nurse Foster.  *Id.* at 552.  The daily pain ached, burned, stabbed, throbbed, pinched, and radiated down plaintiff's right leg.  *Id.*  It caused her to become irritable and depressed.  *Id.* at 553.

On September 10, 2014, plaintiff was seen by Dorothy Bratton-Sandoval, PA-C for her back pain after receiving bilateral sacroiliac joint injections on August 25.  *Id.* at 572.  Her pain had improved by 50% but she continued to experience mild to moderate discomfort in her right buttock and leg.  *Id.*  Examination of plaintiff's lumbar spine and sacroiliac joints was normal except for tenderness at the right sacroiliac joint.  *Id.* at 573.

On November 6, 2014, plaintiff complained to nurse Foster of back pain and reported that a second round of injections to her back on October 1, 2014 had not been as effective as the first round.  *Id.* at 540.  Her back and neck were tender on examination.  *Id.* at 541.

On March 10, 2015, plaintiff reported to nurse Foster that she was experiencing daily chronic pain in her head, shoulder, and back at an 8/10 on the pain scale.  *Id.* at 532.  The pain ached, burned, throbbed, stabbed, pinched, stung, and radiated down her right leg.  *Id.* Examination revealed tenderness at the base of her skull and at her lumbar spine.  *Id.* at 534-35. Nurse Foster increased plaintiff's Norco dosage.  *Id.* at 535.

Plaintiff told nurse Foster on June 15, 2015, that she felt pain in her back and abdomen at a 6/10 on the pain scale.  *Id.* at 507.  The pain ached, burned, throbbed, and radiated down the back of her right leg.  *Id.*  Plaintiff felt a headache caused by her neck tension.  *Id.* at 509.

On July 8, 2015, plaintiff complained to nurse Foster of aching, burning, and throbbing chronic back pain at a 6/10 on the pain scale.  *Id.* at 502.  The pain radiated from her low back through her right leg.  *Id.*  On exam, nurse Foster noted tenderness at the base of the skull and lumbar area.  *Id.* at 505.  She directed plaintiff to continue taking Norco for the pain.  *Id.*

On August 14, 2015, plaintiff told nurse Foster that she experienced chronic burning and stabbing pain on her right hip and back at a 9/10 on the pain scale.  *Id.* at 496.  Standing, sitting,

20

and walking aggravated the pain, which made daily functioning difficult. *Id.* at 496.  Nurse
Foster noted tenderness at the base of plaintiff's skull and lumbar area. *Id.* at 499.

At a September 18, 2015, appointment with nurse Foster, plaintiff reported burning and
pinching chronic pain in her right upper back through her right hip and leg at a 9/10 on the pain
scale. *Id.* at 489.  Walking, standing, and sitting aggravated the pain. *Id.* at 490.  Plaintiff could
not ascend stairs, get in or out of her car, or perform her daily chores. *Id.*  Her back was tender
on examination at the base of her skull and at the lumbar spine. *Id.* at 492.  Nurse Foster
prescribed Norco three times a day to address the pain. *Id.* at 493.

On November 17, 2015, Dr. Holscher noted that plaintiff complained of sciatica pain and
that her right buttock and hip were tender with palpation and that the hip joint was tender when
pressure was applied. *Id.* at 485.  Her lumbar spine was moderately tender with palpation and
the surrounding muscles were tight. *Id.*  She referred plaintiff to a chiropractor and physical
therapy and prescribed Norco three times per day. *Id.* at 486.

On January 18, 2016, an X-ray of plaintiff's lumbar pain showed "some exaggeration of
normal lumbar lordosis." *Id*. at 593.  An X-ray of her cervical spine showed "mild lower
cervical disc space narrowing" and slight "anterolisthesis." *Id.* at 594.

On February 2, 2016, Dr. Holscher noted that plaintiff complained of low back and
cervical pain. *Id.* at 472.  Plaintiff's X-rays were essentially normal, though her exam showed
some spasm. *Id.*  Dr. Holscher prescribed Butrans and noted that plaintiff had violated her
controlled substances management agreement three times. *Id.*  Dr. Holscher discontinued
plaintiff's prescription for Ativan, writing that plaintiff was not taking it on schedule, it was not
in her urine despite being prescribed and "no bottles brought in last week and bottles empty 8
days early." *Id.*

On February 12, 2016, Dr. Birk found "[d]orsolumbar pain and tenderness with spasm
with limitation to flexion and extension.  Sacroiliac joint tenderness present bilateral." *Id.* at
449.  Plaintiff told Dr. Birk that her back felt like it was on fire despite having received injections
in her sacroiliac joint and other treatment. *Id.*

/////

On February 25, 2016, Dr. Holscher wrote that plaintiff rated her back pain at 7/10.  *Id.* at 468.  The pain was chronic, ached and burned, and radiated from her lower back to her right leg.  *Id.*  Dr. Holscher declined to prescribe opiates because plaintiff had failed her controlled substances management agreement "and her last urine tox screen was inconsistent."  *Id.*

In mid-2016, plaintiff was seen at Gateway Medical Center for her low back pain, which she rated at a 6-7/10 on most days.  *Id.* at 659-77.  On exam, plaintiff showed decreased range of motion in her back and pain with motion.  *Id.*  Dr. Birk noted low back tenderness and spasm on November 30, 2016.  *Id.* at 446.

Plaintiff was seen for her back pain at Greenville Rancheria in late 2016 through early 2017.  Plaintiff consistently reported pain in her middle and lower back radiating down her right leg at a six to seven out of 10 on the pain scale.  *Id.* at 606-35.  The pain was persistent, sharp, shooting, dull, and aching.  *Id.*  Her lumbar spine was tender on examination, and she experienced pain with movement.  *Id.*

Plaintiff received physical therapy for her back pain in 2016 and reported mild improvements therefrom on March 3, 2017.  *Id.* at 643-50.  On assessment in March 2017, plaintiff was partially able to walk on her toes and heels but was apprehensive to forward bending and moving away from her midline due to pain.  *Id.* at 643-44.

D.  *Anxiety, Depression, and Insomnia*

Hearing Testimony.  Plaintiff testified at the March 2019 hearing that she takes Ambien and Klonopin for her insomnia.  *Id.* at 81, 83.  She was set to have a sleep study performed, because she has "an extremely hard time shutting my brain down, whether it's anxiety, whether it's stress or whatnot."  *Id.* at 85.  She lies down about three times every day, for an hour each time.  *Id.* at 90.

Plaintiff testified that her neurologist put her on Zoloft because "a lot of people that have epilepsy or seizure disorders also need antidepressants . . . to counteract the seizure medication.  I never really questioned it."  *Id.* at 82.

Medical Records.  On September 29, 2014, plaintiff reported symptoms indicating major depression to nurse Foster.  *Id.* at 545-46.  She also complained of anxiety.  *Id.* at 547.  On

1  examination, plaintiff had a flat affect and appeared depressed and anxious. *Id.* at 548-59.

2  Plaintiff felt that her anxiety caused headaches. *Id.* at 547.  Nurse Foster prescribed

3  Escitalopram. *Id.* at 549.

4        On March 10, 2015, plaintiff reported to nurse Foster that her intense back pain was

5  causing insomnia. *Id.* at 532.

6        On August 14, 2015, plaintiff reported anxiety to nurse Foster and also reported that she

7  was not sleeping well. *Id.* at 497.  On September 18, 2015, plaintiff complained to nurse Foster

8  of insomnia associated with her severe back pain. *Id.* at 490.

9        At a February 2, 2016, visit with Dr. Holscher, plaintiff was diagnosed with major

10  depression after reporting hopelessness, loss of concentration and appetite, and anhedonia. *Id.* at

11  470-72.

12        In mid-2016, plaintiff was seen at Gateway Medical Center and where she reported

13  severe fatigue on several occasions. *Id.* at 662, 665, 668.

14        Mr. Paxman wrote in his March 2017 function report, "Shelly does not sleep well at all!

15  She has an incredibly hard time falling asleep and then remaining asleep, generally waking up

16  due to pain!" *Id.* at 388.

17        In plaintiff's March 2017 function report, she wrote:

18        Anxiety/depression: I have a hard time sleeping – therefore I am unable to
      function as needed on a regular basis.  Lack of sleep makes it hard for me to

19        concentrate – leaving me highly irritable with a short fuse!  I am always stressed
      over finances.  I find myself constantly putting myself down because temporarily

20        I cannot be financially independent.  I live in constant fear that after 15 years my
      fiancé will eventually get tired of my health issues and inability to bring in an

21        income and either kick me out or leave himself!  Either way – it's hard to focus!

22  *Id.* at 398.  The same month, plaintiff appeared at the medical office of Barbara Morales

23  complaining of anxiety. *Id.* at 702.  She asked for "benzos." *Id.*  Ms. Morales declined due to a

24  notation in plaintiff's records that she should not be given controlled medications, but offered a

25  different prescription. *Id.*  Plaintiff responded that "benzos" were the only medicine that worked

26  and if she could not have them "she will commit suicide and write 'I committed suicide because

27  AWIC did not listen to me or help me.'" *Id.*

28  /////

23

1    Sid Cormier, PhD performed a psychological evaluation of plaintiff on April 17, 2017.

2  *Id.* at 681.  Plaintiff "was in some psychological distress and demonstrated verbal and nonverbal

3  behavior consistent with perhaps over control anxiety." *Id.* at 682.  Plaintiff appeared honest,

4  and Dr. Cormier "discerned no indications of malingering, symptom exaggeration, or symptom

5  minimization." *Id.*  Plaintiff related to Dr. Cormier longstanding severe sleep problems; she

6  typically slept less than two hours per night. *Id.*  She also told him that she was "troubled by

7  occasional headaches, dizziness, and balance problems reactive to epilepsy." *Id.*

8    Plaintiff told Dr. Cormier that her mother, a heroin addict, had abandoned her at age 10,

9  resulting in several foster care placements, and that she had had nightmares and flashbacks ever

10  since. *Id.*  Dr. Cormier opined that plaintiff may suffer from post-traumatic stress disorder as

11  well as prescription opioid dependence (due to her regular and doctor-sanctioned use of Norco

12  for her chronic pain). *Id.*

13    Dr. Cormier reviewed plaintiff's history and medical records. *Id.*  Plaintiff had a family

14  history of mental illness and a traumatic childhood, but she had never been admitted to a

15  psychiatric hospital. *Id.*  However, she had been in and out of counseling for PTSD and

16  currently took Klonopin and Ativan daily for anxiety. *Id.* at 682-83.  Plaintiff had last worked in

17  2009 but stopped "due to receiving a DUI." *Id.* at 683.  She felt that, to work again, her

18  insomnia and seizures would need to be controlled. *Id.*

19    During the exam, plaintiff had a flat affect but displayed logical thinking and intact

20  foresight. *Id.*  Her concentration was good although her abstract thinking ability was below

21  average. *Id.*  She displayed average intellectual functioning. *Id.*  Dr. Cormier found that

22  plaintiff's psychological conditions would not greatly impair her working ability, although he

23  found possibly moderate impairment in plaintiff's ability to perform simple tasks, maintain

24  regular attendance, and complete a normal workday or workweek. *Id.* at 686.

25    In August 2017, plaintiff was seen by Markie Maldonado, PA-C, at NAMHS Redding.

26  *Id.* at 706.  Plaintiff was tearful and emotional and complained of nervousness with vomiting,

27  night sweats, waking up scared and sad, sleeping only a few hours each night, and feeling

28  irritable, anxious, tired, angry, and overwhelmed. *Id.*  PA-C Maldonado prescribed plaintiff

medication and indicated that plaintiff would begin eye-movement desensitization and reprocessing treatment with another provider.  *Id.*

Records from late 2018 to early 2019 from Hill Country Health and Wellness reveal that plaintiff was suffering depression and severe anxiety.  *Id.* at 730-56.  Her constant pain in her abdomen and back prevented her from sleeping well.  *Id.*

## II.    Standard of Review

The court will uphold the Commissioner's decision that a claimant is not disabled if substantial evidence in the record supports the Commissioner's findings of fact and the Commissioner applied the proper legal standards.  *Schneider v. Comm'r of the SSA*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

## III.    Analysis

Plaintiff asserts eight errors by the ALJ, which the court will address in turn.

A. *The ALJ's Determination that Plaintiff's Pancreatic Condition Did Not Medically Equal the Digestive System Listing Until March 6, 2017*

Plaintiff argues that the ALJ correctly found that her pancreatic condition medically equaled the digestive system listing by March 6, 2017, but did not provide adequate reasons for

25

his conclusion that the condition did not equal the listing prior to that date.  The Commissioner argues that the evidence of plaintiff's abdominal troubles prior to that date simply shows that plaintiff had "some symptoms" and is insufficient to show that her disability equaled a listed impairment.  The Commissioner also argues that, because a prior ALJ found plaintiff not disabled as of July 11, 2014, and plaintiff's insured status for DIB expired on December 31, 2014, plaintiff's current case "concerns only her SSI application filed on March 6, 2017."  Thus, according to defendant, any evidence prior to March 2017 is not relevant.

As to this second argument, this case does not concern *only* plaintiff's SSI application. There is manifestly an issue of whether plaintiff became disabled for purposes of DIB on or before the date she last met the insure status requirement.  The Commissioner's argument fails to address the question of whether plaintiff became disabled at any time after the July 11, 2014 "not disabled" finding by the previous ALJ, but prior to the expiration of her insured status on December 31, 2014.  It is the date of onset of plaintiff's disability and whether it occurred prior to December 31, 2014 that is at issue and the medical evidence pertaining to that question must be properly evaluated.

Here, the latter ALJ found that plaintiff became disabled on March 6, 2017, but not before that date.  The implication is that plaintiff's medical condition was not disabling prior to that date but somehow, beginning on March 6, became so severe as to meet the listings of impairments for purposes of presumptive disability under the regulations.  With the nontraumatic onset of disability in this case, the suggestion appears implausible and at a minimum requires a clear explanation with citation to the medical evidence to support that explanation.  For the reasons that follow, the court finds that the ALJ's conclusion that plaintiff's pancreatic condition did not equal the digestive system impairment listings prior to March 6, 2017, but did equal the listings beginning on that date, is not supported by substantial evidence in the record.  (The court will leave to the agency, on remand, to determine when plaintiff's disability began and the impact of the July 2014 decision on plaintiff's case for DIB.)

The ALJ cited two records in finding that the evidence did not support plaintiff's claim of a disabling pancreatic condition prior to March 2017: (1) a report of an ultrasound performed on

April 29, 2015 showing no significant abdominal abnormalities and a normal-appearing pancreas and (2) a July 7, 2015 CT scan showing a normal-appearing pancreas. ECF No. 14-1 at 27-29, 32. The ALJ gave great weight to Dr. Geneve's testimony that plaintiff's impairment met the listings as of December 4, 2017, the first date that he found "documentation of the diagnosis of acute and chronic pancreatitis," "definitive documentation of the abdominal pain and so on," and elevated lipase levels. *Id.* at 57, 61. But the record contains much evidence of abdominal pain and elevated lipase prior to 2017, all consistent with plaintiff's testimony.

The earliest records, from 2011, show that plaintiff was receiving care for abdominal pain that year even though no diagnostic test pinpointed the source of the problem. *Id.* at 1189, 1275. On January 20, 2012, plaintiff went to the ER after vomiting for two days, where she continued to vomit and appeared "in considerable agony." *Id.* at 1155-59. Again, doctors did not "have any answers" for plaintiff. *Id.* at 1159, 1165.

Records show that plaintiff's abdominal symptoms waned in the late summer of 2014, but flared again in November 2014, causing six weeks of diarrhea and a tender abdomen. *Id.* at 542-48. Records show a similar episode in spring 2015, causing pain in her upper left abdomen, vomiting, and abdominal tenderness even though an ultrasound showed the appearance of plaintiff's pancreas to be normal. *Id.* at 527-585.

Plaintiff's abdominal woes did not resolve, resulting in several episodes in the hospital, with express notations of elevated lipase on May 1, 2015 (lipase at 1678, amylase also high) and May 25, 2015 (lipase "very high" at 5000). These episodes continued on through 2015 and 2016. If abdominal pain, tenderness, vomiting, diarrhea, hospital visits, and objective findings of elevated pancreatic enzymes sufficed for Dr. Geneve to find plaintiff's impairment equal to the digestive system listings as of December 4, 2017 (and for the ALJ to rely heavily on that opinion), the same evidence exists in the record prior to both that date and the ALJ's ultimate date-of-choice, March 6, 2017. The court also notes that the record fully corroborates plaintiff's testimony that she had highly elevated lipase levels at some point in 2015.

While there is some evidence in the record showing that these episodes of pancreatic pain were not always constant, that plaintiff's enzyme levels were sometimes normal, and that some

27

diagnostic imaging tests could not discern her pancreas divisum,[10] this evidence is not substantial in the face of overwhelming evidence that the condition existed prior to March 6, 2017,[11] and caused plaintiff the same flare-ups of pain, vomiting, and diarrhea in the years prior to that date as it did after. While doctors may not have been able to correctly diagnose the cause of plaintiff's pancreatitis (many believed it to be caused by plaintiff's seizure medication), plaintiff testified that she had suffered pancreatitis from 2009, and the medical records support that testimony, showing flare-ups of increasing incidence in the following years. This court must review the ALJ's decision to discredit that testimony for specific, clear, and convincing reasons. *Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014). Two imaging tests in 2015 that failed to reveal plaintiff's defective pancreas do not stand up against the evidence of repeated flare ups of severe pancreatitis that required treatment (including hospitalization) prior to March 6, 2017, objective laboratory findings of very elevated pancreatic enzymes on two occasions in 2015, and plaintiff's consistent testimony and reports to care providers.

B. *The ALJ's Failure to Address Plaintiff's Migraines and Chronic Pain Syndrome at Step Two*

Plaintiff next argues that the ALJ erred by failing to address plaintiff's migraines and chronic pain syndrome at step two of the disability analysis. The Commissioner concedes this error, but argues that the error was harmless, because the ALJ discussed these impairments when formulating plaintiff's RFC.

In *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007), the Ninth Circuit found that an ALJ's failure to consider an impairment at step two was rendered harmless by the ALJ's consideration of the impairment in determining whether the claimant's impairments met or medically equaled a listed impairment (currently step four of the sequential process). Here, the ALJ's consideration of plaintiff's migraines consisted of merely noting that they were doing better on September 12, 2014, but had increased by November 13, 2014. ECF No. 14-1 at 28.

---

[10] The court's review of the record found that Dr. Parvinder Singh first diagnosed plaintiff's pancreas divisum in April 2018 following an endoscopic ultrasound. *Id.* at 712.

[11] Plaintiff's testimony that the condition is caused by a defect present from birth is unrebutted.

28

His consideration of her chronic pain was similarly cryptic: "Since beginning treatment at Greenville Rancheria, July 29, 2016 progress notes show that the claimant was prescribed Norco and she was noted as having fair control over her chronic pain." *Id.* at 29. These brief references do not fully summarize or consider the record evidence of either impairment.

On May 24, 2014, plaintiff went to the ER after suffering a three-day headache with fatigue and confusion. *Id.* at 1146. While, as the ALJ noted, plaintiff reported that her migraines were doing better on September 12, 2014, she also reported two months later that they were worse and that she was experiencing migraines three times each week. *Id.* at 451-54. In September 2015, plaintiff reported having intermittent migraines for several weeks, one of which lasted for three days and led plaintiff to seek treatment in the ER. *Id.* at 490, 1040. Plaintiff's migraines were stable on February 12, 2016, but the stability did not last; on October 16, 2017, plaintiff reported that her migraines were not improving. *Id.* at 452, 758. Plaintiff testified that, at the time of the hearings, she was experiencing one migraine each week, which sometimes lasted for days and were not always alleviated by medication. *Id.* at 82-83. The ALJ did not address the bulk of this evidence.

The evidence concerning plaintiff's chronic back pain, or chronic pain syndrome, is vast. Beginning in 2014 (in the records presented to the administration), plaintiff reported pain at the base of her skull, which was corroborated by Dr. Birk's physical examination and treated with Kenalog injections. *Id.* at 459. Plaintiff also suffered pain in her lumbar spine which she described consistently to her care providers beginning in 2014. While nerve conduction and other studies performed in August 2014 by Dr. Joseph Purcell revealed only a "non-specific finding if uncertain clinical significance" possibly caused "by remote history of ankle or foot trauma," an exam less than a week later by Dr. Annie Purcell revealed tender sacroiliac joints and limited lumbar range of motion in all directions due to pain. *Id.* at 564-69. Dr. Annie Purcell reviewed Dr. Joseph Purcell's findings and, after examining plaintiff, diagnosed her with bilateral sacroiliac joint disorder and chronic low back pain. *Id.* at 569.

Plaintiff's back pain worsened to 10/10 on the pain scale by August 12, 2014. *Id.* at 552-53. Injections to the sacroiliac joint improved plaintiff's pain by 50-70% by October 2014, but

1  the tenderness remained.  *Id.* at 572-73, 540-41.  But by March 2015, the pain had returned to an

2  8/10 on the pain scale.  *Id.* at 532.  As summarized in the background section, above, plaintiff's

3  back pain has never been effectively treated, although it is somewhat reduced by plaintiff's Norco

4  prescription.  Plaintiff's reports to care providers have been consistent, and her physical exams

5  have also consistently shown tenderness in her cervical and lumbar spine.  The levels of pain

6  reported by plaintiff, and the decision of medical providers to prescribe a narcotic to combat it,

7  support plaintiff's statements over the years of extreme pain that made daily functioning difficult.

8  *E.g.*, *id.* at 496, 490, 605-35, 643-44.  Contrary to the ALJ's statement, the records of treatment

9  from Greenville Rancheria beginning in 2016 are consistent with the prior records, showing

10  severe back pain and a tender spine.  *Id.* at 605-35.  While some chart notations from this time

11  period indicate "fair control" over plaintiff's chronic pain, others indicate "poor control."  *E.g.,*

12  *id.* at 621, 624.  Instead of grappling with the many, voluminous records showing severe and

13  chronic pain, the ALJ focused on the very few records that supported discounting plaintiff's back

14  pain.  Because the ALJ did not fully and fairly consider the evidence of plaintiff's back pain and

15  migraines in formulating her RFC, the court cannot conclude that his consideration of those

16  impairments at step five rendered his failure to consider them at step two harmless.  *See Reddick*

17  *v. Chater*, 157 F.3d 715, 722-23 (9th Cir. 1998) (an ALJ may not support conclusions with

18  evidence cherry-picked from the record that is not consistent with the record as a whole); *Rachel*

19  *B. v. Comm'r of Soc. Sec.*, No. 2:19-CV-1574-DWC, 2020 U.S. Dist. LEXIS 69054, at *11-12

20  (W.D. Wash. Apr. 20, 2020) (same).

21        C.  *The ALJ's Determination that Plaintiff's Mental Impairments Were Non-Severe*

22        Plaintiff argues that the ALJ's decision at step two that her mental impairments were not

23  severe resulted from legal error and is not supported by substantial evidence.  The ALJ based this

24  determination on: (1) the opinions of state agency consultants Drs. Covell and Kester that

25  plaintiff's mental impairments were non-severe; (2) the "little documentation of ongoing mental-

26  health specific treatment"; (3) plaintiff's neurological examination findings, which tended to be

27  normal when plaintiff was on medication; and (4) the facts that plaintiff's records only showed

28  /////

1   mental-health specific care between July and October 2017 and her GAF score of 50 only

2   reflected "a narrow period of time."[12]

3       Plaintiff first argues that the ALJ committed legal error by limiting his consideration of

4   mental health records to "mental-health specific treatment."  The Commissioner does not respond

5   to this assertion of error.  Indeed, plaintiff is correct: the administration must consider evidence of

6   mental health treatment from general practitioners, who often provide mental health treatment.

7   *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  Here, plaintiff's medical providers

8   diagnosed her with major depression and anxiety and treated those ailments beginning in

9   September 2014.  ECF No. 14-1 at 546-49.  Her treatment records, summarized in the background

10  section above, evidence that treatment on numerous occasions over the years for anxiety,

11  depression, and insomnia (which the ALJ did not mention in discussing plaintiff's mental

12  impairments despite plaintiff's frequent complaints throughout the medical record that her other

13  ailments made it impossible to sleep effectively).  The ALJ's apparent refusal to consider or his

14  discounting of this evidence as not being "mental-health specific" was error.

15      Plaintiff next argues that the ALJ erred by giving great weight to the opinions of Drs.

16  Kester and Covell, because both doctors erroneously assumed that the 2014 ALJ determination

17  should be given deference under *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988) when the ALJ

18  himself found *Chavez* inapplicable due to changes to the administration's mental impairment

19  regulations.  The Commissioner does not respond to this argument, either.  It does appear from

20  the record that Drs. Covell and Kester accorded a presumption of continuing non-severity to

21  plaintiff's mental impairments based on the prior ALJ decision while the ALJ found that no

22  *Chavez* deference was proper.  *See* ECF No. 14-1 at 119, 172-73.

23      Plaintiff also argues that the ALJ should not have discounted the opinion of Dr. Cormier.

24  The ALJ reasoned that Dr. Cormier's opinion was not reliable for several reasons.  First, he noted

25  that Dr. Cormier opined that plaintiff was excessively limited despite her generally normal mental

26  ──────────────

27  [12] "GAF score" refers to the Global Assessment of Functioning, which "is a scoring system for
    the severity of illness in psychiatry."  "Guidelines for Rating Global Assessment of Functioning
    (GAF)," National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/

28  articles/PMC3036670/ (last visited March 20, 2022).

status exams.  However, the ALJ did not identify the exams he relied on or explain how these normal exams related to the limitations identified by Dr. Cormier.

Second, the ALJ noted that Dr. Cormier's opinion was inconsistent because he stated that plaintiff was "quite capable of adjusting to routine changes on the job site" but also was impaired in her "ability to adjust to routine changes on the job site" and because he opined that plaintiff was moderately impaired in performing simple and repetitive tasks but was "quite capable of accepting and remembering instructions from supervisors." *Id.* at 25.  Plaintiff argues that the ALJ manufactured these inconsistencies.

Indeed, a review of Dr. Cormier's opinion reveals two statements with regard to plaintiff's ability to adjust to routine changes on the job site that are entirely consistent with one another: (1) "Formal memory testing suggested that she is quite capable of . . . adjusting to routine changes on the job site" and (2) "Her reported history in response to the stress of the evaluation did not necessarily suggest impairment with respect to her ability to adjust to routine changes on the job site." *Id.* at 686.  Additionally, it is not inconsistent to opine that a person has a moderate impairment in performing simple and repetitive tasks but can accept and remember instructions. As Dr. Cormier's purportedly inconsistent statements are not actually inconsistent, the ALJ's determination that Dr. Cormier's opinion was due little weight because of these "inconsistencies" was error.

Third, the ALJ discounted Dr. Cormier's opinion because he found it inconsistent with the activities of daily living plaintiff reported to Dr. Cormier.  *Id.* at 26; *see generally Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (holding that a conflict between a medical opinion and a claimant's daily activities can justify an ALJ's rejection of the opinion).  Dr. Cormier wrote that plaintiff was "reportedly capable of showering and dressing herself, paying bills, shopping, preparing meals, driving, and doing necessary chores."  ECF No. 14-1 at 683.  The ALJ failed to explain, however, how plaintiff's ability to perform these tasks was inconsistent with Dr. Cormier's opinion that she may be moderately limited in her ability to perform simple tasks, maintain regular attendance, and complete a normal workday or workweek.  *See Ghanim*, 763 F.3d at 1162 (finding an ALJ's rejection of a medical opinion as inconsistent with the claimant's

32

daily activities to be error where the opinion was not inconsistent with "a holistic view of the record"). "A claimant need not be completely incapacitated to receive benefits." *Id.* "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). For this reason, the Ninth Circuit allows an ALJ to discredit a claimant's testimony as inconsistent with daily activities only where the claimant "is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Similarly, to discredit Dr. Cormier's proffered limitations on the basis of plaintiff's daily activities, the ALJ should have explained how those daily activities suggested that plaintiff could perform at a job without being as limited as Dr. Cormier opined.

The Commissioner argues that Dr. Cormier's opinion is irrelevant to the question of whether plaintiff was disabled at the end of 2014 (when her insured status for DIB benefits expired) because his opinion came from a single examination performed in April 2017. Thus, according to the Commissioner, any error by the ALJ with respect to Dr. Cormier's opinion was harmless. However, Dr. Cormier's opinion is probative of plaintiff's capabilities, especially in the absence of evidence that plaintiff's mental impairments had deteriorated between 2014 and 2017. Accordingly, the court cannot find the error harmless.

D. *The ALJ's Lack of Comment on the Records of Physical Therapist Earle*

Plaintiff argues that the ALJ erred when he failed to explicitly address the disability opinion of James Earle, MPT. Mr. Earle began treating plaintiff for her low back pain on

/////

/////

/////

/////

33

November 17, 2016.  ECF No. 14-1 at 648-50.  After examining plaintiff, Mr. Earle wrote that she:

> demonstrates decreased functioning motion, decreased functional strength, decreased activity tolerance and increased reports of pain.  Her functional index score of 62 indicates severe limitations which is consistent with current objective findings and subjective report.

*Id.* at 649.

To reject the opinion of a treating physician and certain other medical specialists, an ALJ must provide specific, legitimate reasons based on substantial evidence in the record.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).  While Mr. Earle, a physical therapist, was not a physician or specialist subject to this standard, the ALJ was required to consider his opinion in determining the severity of plaintiff's low back impairment and how it affected her ability to function.  *Id.*; SSR 06-03p, 2006 SSR LEXIS 5, at *5-8.  To reject Mr. Earle's opinion, the ALJ was required to provide "germane" reasons.  *Molina,* 674 F.3d at 1111.

The Commissioner concedes that the ALJ did not mention Mr. Earle's assessment in his opinion.  She argues again, however, that the error was harmless because the evidence post-dated plaintiff's last date insured for disability insurance benefits.  Again, the court finds this argument unpersuasive.  Mr. Earle's opinion corroborates plaintiff's own description of her back impairment and other medical records dating from before her last date insured.  It is thus relevant to the question of plaintiff's abilities at that time, especially in the absence of evidence that plaintiff's back condition changed between 2014 and Mr. Earle's treatment in 2016.

E.   *The ALJ's Reasons for Discrediting Plaintiff's Testimony*

Plaintiff argues that the ALJ did not provide clear and convincing reasons for discounting plaintiff's testimony with regard to her ailments prior to March 2017.  In the Ninth Circuit, an ALJ must engage in

> a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.  In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some

34

1
2

degree of the symptom.  Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof.

3
4

If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

5

6   *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (internal citations and quotation marks

7   omitted).  The ALJ must state which testimony is not credible and what evidence supports that

8   determination.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir 1993).  The reasons provided must

9   be specific enough to allow a reviewing court to determine that the ALJ's rejection of the

10  claimant's testimony was not arbitrary.  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

11          There is no dispute in this case that plaintiff satisfied the first step of this analysis.  The

12  Commissioner argues that the ALJ properly supported his decision that plaintiff's testimony was

13  not "entirely consistent" with the evidence prior to March 2017.  Plaintiff argues that the reasons

14  provided by the ALJ consisted of "a recitation of treatment notes . . . [f]rom [which] one intuits

15  the ALJ intends to discredit unspecified aspects" of plaintiff's claims about the severity of her

16  symptoms.  The court agrees.  In pages 8-9 of the ALJ's decision, he recites a list of treatment

17  notes dating prior to March 2017.  It is not clear at all how these excerpts from the medical record

18  discredit plaintiff's testimony, however.  The ALJ again relied on records showing that physicians

19  had yet to determine why plaintiff was suffering seizures and abdominal pain, but he failed to

20  explain how the inability of diagnostic imaging and other medical testing to uncover the root

21  cause of plaintiff's symptoms makes her testimony about her epilepsy and pancreatic condition –

22  which she unquestionably suffers from – less credible.  ECF No. 14-1 at 28 (noting that Dr. Burke

23  was "not sure about the cause for seizures" after reviewing normal brain imaging and that

24  abdominal imaging in 2015 showed a normal-appearing pancreas).

25          In addition, the ALJ relied on plaintiff's medication non-compliance in discrediting her

26  testimony about the severity of her epilepsy.  Under Social Security Ruling 16-3p, the

27  Administration will not find an individual's symptoms inconsistent with the record by reasons of

28  not treating the symptoms without considering the reasons the individual failed to treat.  Such

failure to treat includes not taking medication because the side effects are less tolerable than the symptoms.  For that reason, courts have held that an ALJ may not draw adverse inferences from an individual's failure to take epilepsy medication without considering the individuals reasons for not taking the medication.  *Bradshaw v. Kijakazi*, No. CV-120-152, 2022 U.S. Dist. LEXIS 24448, at \*13-14 (S.D. Ga. Jan. 19, 2022); *James G. v. Comm'r of Soc. Sec.*, No. 1:19-cv-03193-LRS, 2020 U.S. Dist. LEXIS 251710, at \*16, 26-27 (E.D. Wa. Apr. 17, 2020).  Here, the record contains numerous notations by plaintiff's doctors indicating that her seizure medication could be the cause of plaintiff's severe abdominal pain, before her pancreas divisum was discovered.  The ALJ's failure to consider this obvious reason, along with other reasons provided by plaintiff for failing to take the proper dosage of her anti-seizure medication at times, was error.

F. *The ALJ's Failure to Consider All of Plaintiff's Impairments, Individually and in Combination in Determining Plaintiff's Residual Functional Capacity*

Plaintiff argues that the ALJ failed to consider the effect of plaintiff's impairments, in combination, in formulating plaintiff's RFC.  According to plaintiff, the ALJ also erred by failing to consider plaintiff's migraines, mental impairments, pancreatitis, chronic and severe fatigue, and pain disorder.

An ALJ's failure to consider all of a claimant's impairments, individually and in all combinations, is error.  42 U.S.C. § 423(d)(2)(B).  The Commissioner does not contend that the ALJ correctly assessed the effect of plaintiff's impairments in combination, but argues that the evidence relied on by plaintiff is irrelevant as dating after the end of 2014.  But, again, evidence post-dating 2014 is not wholly irrelevant, as it can corroborate evidence and testimony from 2014 and before.  In addition, the record is not devoid of evidence prior to December 31, 2014.  As it is undisputed that the ALJ failed to consider the effects of all of plaintiff's impairments singly and in combination, his decision cannot stand.

G. *The ALJ's Failure to Reopen Plaintiff's Prior Disability Application*

Finally, plaintiff argues that the ALJ erred by not reopening plaintiff's earlier disability application (that had resulted in a denial of benefits in July 2014).  The Commissioner argues that the time for reopening that decision had already elapsed by the time plaintiff filed the instant

1  disability application.  Because the court finds that the case should be remanded to the

2  Administration to cure the errors identified herein, and because the propriety of reopening

3  plaintiff's earlier disability application is debatable, and may also be unnecessary to decide, the

4  court will leave the question for the Commissioner to address on remand.

5      **H.  Order**

6          For the foregoing reasons, it is ORDERED that:

7      1.  Plaintiff's August 3, 2021 motion for summary judgment (ECF No. 19) is

8          GRANTED;

9      2.  Defendant's September 21, 2021 cross-motion for summary judgment (ECF No. 23) is

10         DENIED;

11     3.  The Clerk is directed to enter judgment in plaintiff's favor; and

12     4.  The matter is remanded to the Social Security Administration for further proceedings

13         consistent with this order.

14  Dated: April 22, 2022.

15

16                                  EDMUND F. BRENNAN
                                    UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28